A. CAPEHART *et al,* Executors of W. J. Capehart, deceased, vs. W. P. BURRUS and wife.

(Decided March 1st, 1898.)

*Will, Construction of—Intention of Testator—Description of Property Disposed of by Will—Technical Word "Stock."*

1. In construing a will, it must be considered as a whole for the purpose of arriving at the intention of the testator which must always prevail.

2. In construing a will, words of art should be taken in their technical meaning unless it appears that they were used in a different sense, and when the language used is not "words of art" it should be construed to have the meaning of such words in ordinary parlance.

3. The primary meaning of the word "stock," in law language, is choses, bonds, evidence of interest in incorporated or joint stock companies, &c.

4. Where a testator gave his wife several tracts of land, two horses, two cows and other personal property, and, by other items, gave lands to each of several children, and, in another item, declared that "all my notes, bonds, stock and money on hand I wish divided between my wife" and children named; *Held,* in an action to construe the will, that the word "stock" means bonds and evidence of interest in companies and not "live stock," notwithstanding the fact, as discovered after the death of the testator, that he had no shares of stock when the will was written, or at his death, but did have a large amount of live stock.

FAIRCLOTH, C. J., and CLARK, J., dissent.

CIVIL ACTION by the Executor of W. J. Capehart to construe the will of the testator and to obtain advice and directions as to settlement of the estate, heard before *Brown, J.,* at December, 1897, Special Term of BERTIE Superior Court. The facts appear in the opinion. His Honor sustained the contentions of the defendants and plaintiffs appealed.

*Mr. Francis D. Winston,* for plaintiffs (appellants).
*Messrs. Simmons, Pou & Ward,* for defendants.

FURCHES, J.: The principal question presented in this appeal is the meaning to be given to the word "stock" in construing the will of W. J. Capehart. It appears from the will that the testator was a man of considerable estate; that on the 5th day of December, 1894, he made the will under consideration and died in March following. At the time of making the will he had a wife and several children, all of whom were living at the time of his death.

By the third paragraph of his will, he devised to his wife, Eliza Mason Capehart, three several tracts or parcels of land in fee simple. By the fourth paragraph he willed to his said wife two horses to be selected by her, two milch cows to be selected by her, one buggy and harness, corn, fodder, and one thousand pounds of pork from the gallows, all his poultry, and all his household and kitchen furniture, except the organ, piano, and the furniture in Minnie's room. These he gave to Minnie by the next paragraph of his will.

By the 8th paragraph he gives one tract of land, and mills and gins thereon, to his daughter, Minnie Capehart, in fee simple.

By the 8th paragraph he loans to his daughter, Martha Tyler, for her natural life "her home tract of land," and then in fee simple to her children.

By the 10th paragraph he loans to Susan Tyler, another daughter, for her natural life, two tracts of land in Northampton County, and at her death to her children.

By the 11th paragraph he gives to Margaret Burrus, another daughter, a tract of land in Northampton County called the "Brown tract," for her life only, and at her death to Lizzie Burrus, in fee simple.

CAPEHART *v.* BURRUS.

By the 12th paragraph he devises to his son, Dr. A. Capehart, in fee simple, the Indian Woods place.

By the 13th paragraph he devises to Leroy Capehart, another son, the land on the right hand side of the public road in Roxabel.

By the 14th paragraph he provides that "all my notes, bonds, stock and money on hand, I wish divided between my wife, Eliza Mason Capehart, Minnie Martin Capehart, Margaret Lula Burrus, Leroy Capehart and Dr. A. Capehart."

By the 15th paragraph he provides that all the rest of his estate "whether named in this item or not, consisting of both real and personal property, I direct my executors to sell as follows : The personal property for cash, and the lands on a credit of five years, on equal instalments with retained title until the lands are paid for. I express and give my executors full authority to sell and dispose of said lands not herein mentioned by me, and as herein directed."

By the 16th paragraph he provides that, out of the proceeds arising from the sale of the property mentioned in the 15th paragraph of his will, his executors are directed to pay the following: To Helen Tyler, one hundred dollars; to Bertie Tyler, one hundred dollars; to Charles C. Tyler, one hundred dollars; "and all the rest and residue of said sum, so arising from said sales, I give equally share and share alike to Dr. A. Capehart, Leroy Capehart and Minnie Martin Capehart."

There are some general rules to be observed in construing a will: That the whole will must be considered for the purpose of arriving at the intention of the testator, if that can be done, and then to put such construction upon the will as will carry out the intention of the testator, if the language used therein will authorize the Court to do so. *Brawley* v. *Collins,* 88 N. C., 605;

that words of art should be taken in their technical meaning, unless it appears from the will that they were used in a different sense; that when the language used is not "words of art," it should be construed to have the meaning of such words in ordinary parlance. And there are other general rules which do not apply to this case. But, at last, every will stands alone and must be construed alone. There are no fixed and certain rules to guide the court in making the construction.

With these general observations, we will proceed to put such construction on this will, as it seems to us the language used will authorize, and most nearly carry out the intention of the testator—as we are not authorized to make his will, but only to interpret its meaning from the will itself. *Brawley* v. *Collins, supra.*

It is contended by the plaintiffs that the word "stock," used in the 14th paragraph, means choses, bonds of corporate bodies, or of governments, or evidence of shares in corporations or joint stock companies, while the defendants contend that it means live stock, horses, mules, cattle, etc. The Court below adopted the defendants' contention, and held that it meant live stock—domestic animals. In this, we are of the opinion there was error, and that the plaintiffs' contention is correct, that is, that it means dead stock, choses, bonds, evidence of an interest in capital stock of some incorporated or joint stock company.

This is the primary meaning, in law language, of the word "stock." The 23rd American & English Encyclopedia of Law has a chapter entitled "Stock," and in a treatment of over one hundred pages this word is given no other meaning than that given to it in this opinion. On page 584 of this volume, the discussion commences, and the meaning of the word "stock" is given. This

author says that the word "stocks" "is sometimes used, but with doubtful accuracy, and it is at least obsolescent." Besides this, it is used in the same sentence with "all my notes, bonds, stock and money on hand." This, in our opinion, is significant of the meaning the testator intended it to have. It is in the wrong place, or, as was said by counsel, "it is in the wrong stable for horses and mules."

In *Brawley* v. *Collins*, 88 N. C., 605, the testator gave his wife a life estate in a part of his lands, and devised other parts in fee simple. He made no express disposition of the remainder of the land he willed to his wife for life. This devise to his wife was in 11, in which he provided as follows: "It is my will that all *property*, money and effects willed by me to my wife Mary, that may be left at her decease, shall be equally divided between my daughter Betsy, and grandsons, Stephen Brawley and Peter W. Brawley." Upon the death of the wife, Stephen and Peter claimed two thirds of the land willed to their grandmother, Mary, for life, under section 11, of the will. In construing this will, the Court say "that the word *property* is used in the 9th, 10th and 11th, clauses of the will, and in the two former, evidently to designate personal things. In the 10th clause, it follows an enumeration of certain small articles of household furniture, and is plainly intended to cover such articles as are not specifically mentioned, but are of the same general class with those that are mentioned." In the succeeding clause (the clause under which Stephen and Peter claim) "it is in association with money and effects, and is, as in the preceding, necessarily confined to personalty, since all the property not named in the will must exclude realty, which is named and devised." "The 11th clause also associates

all property, money and effects, and as the other disposed of what had been omitted, this disposes of what had been specified and given to the widow, which remained at her death. The words are evidently used in the same sense in both paragraphs, and bear an obvious relative meaning to each other."

It seems to us that this comes as near being a case directly in point as can well be found, in the construction of wills. And if the words "all *property*" are to be construed to mean only *personal* property because they are used in association wiih the disposition of personal property in the two preceding paragraphs of that will, then the word "stock," when used in the same paragraph and in the same sentence with notes, bonds and money (all of my notes, bonds, stock and money on hand) in the will under consideration, would be given the meaning contended for by ·the plaintiffs—the same kind of personal property, as notes bonds and money.

This interpretation and construction are supported by other dispositions of the will. The testator had previously given to his wife two choice horses, two choice milch cows and a thousand pounds of pork. So, he could not dispose of *all* his live stock in paragraph 14, as claimed by the defendants, without defeating the former provision made for his wife, and this should be considered in giving an interpretation of the will. *Ruffin* v. *Ruffin*, 112 N. C., 102.

It was contended by the defendants in support of their contention that "stock" must mean live stock, such as horses, mules, etc., and that the testator had no such "stock," as contended for by the plaintiff, at his death; and that, if the plaintiff's contention is correct, the testator was willing something he did not have. This may be so, and still, in our opinion, not make "stock," as used in this will, mean live animals. If it be true that he

had no "stock" securities at the time the will was written, nor at the time of his death, this fact does not appear in the will, which must be construed from what appears in the will itself. *Brawley* v. *Collins, supra.* From what appears in the will, the testator was a man of considerable wealth and was able to own such "stock." A will speaks as of the date of the testator's death. *Champion Ex parte,* 45 N. C., 246. And if we were allowed to speculate as to this matter, it may be that he expected to own such stock at his death. But this is not necessary, and, as no such thing appears in the will, we are not allowed to do so. This we think is a different question from that raised in the cases cited by the defendants, where the question was as to whether stock, deposited in a bank, passed to the legatee by the language "all my bank stock" in that bank, when the testator owned no stock in the bank, but had stock on deposit in the said bank. This was more a question of latent ambiguity than a construction of the will—of fitting the thing willed to the will. And the Court held that it was clearly the intention of the testator to dispose of this stock in the bank to the legatee named, and that he had used language sufficiently explicit to do so. This is not the case in this will.

It is admitted here that the live stock is disposed of either by this or the next succeeding paragraph of the will. This is the residuary clause, and directs the executors to sell all the rest and residue of his property, both real and personal, not heretofore disposed of by this will. The live stock was not disposed of, unless it is by the word "stock" in the 14th paragraph, except the two horses and the two cows given to the testator's wife.

It was contended that the testator had a large amount

of live stock and that is used as an argument in favor of their contention. It does not appear from the will what live stock he had, and, if it did, we fail to see the strength of this argument that the defendants' counsel saw.

There is error in the judgment below. The word "stock," as used in the 14th paragraph (written 13th) of the will of W. J. Capehart does not mean live stock, such as horses, mules, etc. . Such horses, mules and other live stock, as belonged to. the testator at his death, are included in the 15th paragraph (written 14th) and it is the duty of said executor to proceed to sell the same as therein provided, and, out of the proceeds of such sales, he will pay the testator's debts and the costs and expenses of administration, and, then, out of the proceeds arising from these sales, pay the legacies of $100 each to Helen Tyler, Bertie Tyler and Charles C. Tyler, and the residue thereof, he will divide equally between Dr. A. Capehart, Leroy Capehart and Minnie Martin Capehart as provided in said paragraph of said will.                                                        Error.

There will be judgment according to this opinion.

CLARK, J., dissenting:  By the 13th paragraph of the will, the testator provides that all his "notes, bonds, *stock* and money in hand" should be divided between his wife and four children named.  Now, if the testator had possessed both kinds of stock, investment stocks and live stock, by the settled rules of construction the "stock" would be taken from the context to be investment stock.  But this is a mere rule of construction to aid in the ascertainment of the testator's intent and does not apply in a case like this.  Here it is alleged in the complaint and admitted that the testator had not a dollar of investment stock but had a large quantity of live stock.

In arriving at his intent it is just and natural to con-
clude that he intended to divide the kind of stock he
had and not that kind which he did not have. *Clark* v.
*Atkins*, 90 N. C., 629 and cases there cited. Further-
more, in order to arrive at the intent of the testator,
which is the sole object, it is proper to consider the con-
dition of the testator's family and estate, and the kind
and extent of property he owned at the time of making
the will. *Lassiter* v. *Wood*, 63 N. C., 360; *Edens* v.
*Williams*, 7 N. C., 27. It is therefore corroboration of
this view that the testator had given the bulk of his
large landed estate to his wife and the same four chil-
dren who are named in clause 13, and that his live stock
was necessary to the working and stocking of said
farms, while, if the word "stock" in said 13th clause is
held meaningless, the live stock would be thrown into
the residuary clause (14th paragraph) by which it is to
be sold, and (after some small legacies) the proceeds are
to be divided (clause 15) among three only of those chil-
dren who are named in the 13th clause, thus leaving
out, without any imaginable cause, the wife and the
other child who, with these three, had participated in
the nearly equal division of his realty and of the notes,
bonds and money. These two would thus be called on
to buy live stock to furnish and work the farms devised
to them, while the other three children, instead of get-
ting the corresponding one fifth of the live stock to work
their one fifth of the realty, get more than enough, i. e.
one third. This result would also seem to indicate that
by the word "stock," in clause 13, the testator meant to
divide such stock as he had—live stock—among the five
between whom he shared the bulk of his realty. The
fact that, in clause 3, he had given his wife a small quan-
tity of personal property with "two horses and two

cows to be selected by her," does not militate against this view. That clause, construed in connection with clause 13, is more like the allotment of a year's provisions to the wife in addition to her child's part of the personal property. On this point, I concur with the Judge below.

FAIRCLOTH, C. J.: I concur in the dissenting opinion.